## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES E. BECK, | CASE NO. 1:14-cv-00031-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION<br>TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 8, 9, 10, 13, 14 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Charles E. Beck Jr. for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). As an initial matter, Plaintiff failed to comply with a Court order dated November 14, 2014 to notify the Court if the matter was fully briefed and ready for review. Doc. 14. That order stated "PLAINTIFF'S FAILURE TO RESPOND TO THIS ORDER WILL RESULT IN A RECOMMENDATION TO DISMISS FOR FAILURE TO PROSECUTE PURSUANT TO LR 83.3.1." *Id.*   Thus, the Court recommends dismissing Plaintiff's appeal for failure to prosecute in accordance with its November 14,

2014 order and Local Rule 83.3.1.

The Court also recommends denial upon review of the merits of the case. Plaintiff asserts that he is disabled from a combination of physical and mental impairments, that his impairments meet a Listing, and that the administrative law judge ("ALJ") erred in assessing his residual functional capacity ("RFC"). With regard to mental impairments, Plaintiff has never been treated by a mental health professional, and the only mental status examination in the record is from a consultative examiner who concluded that Plaintiff did not meet any mental impairment Listing and had only slight or moderate nonexertional mental limitations. Thus, the ALJ had substantial evidence to conclude that Plaintiff did not meet a mental impairment Listing. The ALJ discounted claims of mental limitation on the ground that they were based on non-credible subjective complaints by the Plaintiff. Plaintiff did not challenge this finding. Moreover, any error in failing to assess those limitations is harmless, because the vocational examiner ("VE") identified jobs that Plaintiff could perform that did not require him to make judgments on the job or deal with work changes. Finally, Plaintiff fails to develop his argument regarding residual functional capacity ("RFC") beyond a conclusory, generic challenge, which waives the argument.

With regard to physical impairments, Plaintiff contends that he is disabled because abnormalities in his spine cause pain and limited motion in his spine along

with numbness and tingling in his fingers. He asserts that he meets Listing 1.04A, but never alleges or establishes muscle weakness accompanied by sensory or reflex loss, which is required for Listing 1.04A. He asserts that he meets "Listing 11.00(C)," but Section 11.00(C) is not an independent Listing; it is an explanatory definition for a term used in various Listings. Regardless, Section 11.00(C) requires "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances." Plaintiff has never alleged that he has any of these characteristics, and at every physical exam, his sensation was normal.

Plaintiff generically challenges the ALJ's physical RFC, but does not develop his argument. Even if he had, substantial evidence supports the ALJ's physical RFC. The only evidence of the intensity, frequency, and limiting effects of Plaintiff's symptoms is his subjective testimony, and the ALJ properly found Plaintiff to be not credible. With regard to numbness and tingling in his fingers, the ALJ noted that Plaintiff continued to drive, hunt, and fish and that his treating physician opined that there was no evidence of any radiculopathy. The ALJ generally found that Plaintiff made inconsistent claims throughout the record, Plaintiff's treating physicians opined that he could work at heavy exertional levels, and Plaintiff was not treated for his impairments at all between April of 2009 and August of 2010, despite alleging disability beginning in January of 2009. These are proper bases to discount Plaintiff's credibility regarding his symptoms, and

Plaintiff has not challenged the ALJ's credibility finding. Because the only evidence of Plaintiff's physical RFC limitations was his subjective testimony, and the ALJ properly found that testimony to be not credible, Plaintiff failed put forward any credible evidence establishing his limitations. As a result, substantial evidence supports the ALJ's physical RFC determination. Even if the ALJ had erred in failing to assess additional postural or range of motion limitations, any error would be harmless because the VE identified jobs that never required postural abilities and could be performed even if Plaintiff could only "occasionally" turn his head from side to side. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.   Procedural Background

On May 16, 2011, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 104-115). On July 14, 2011, 2010, the Bureau of Disability Determination denied these applications (Tr. 59-68), and Plaintiff filed a request for a hearing on August 18, 2011.  (Tr. 71-72). On March 14, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 30-58). On August 27, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 10-29). On February 13, 2013, Plaintiff filed a request for review

with the Appeals Council (Tr. 7-9), which the Appeals Council denied on November 20, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On January 9, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On May 13, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On June 20, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 10). On August 21, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 13). On November 5, 2014, the Court referred this case to the undersigned Magistrate Judge. On November 14, 2014, the Court issued an Order for Plaintiff to notify the Court whether the case was ready for review and stated "PLAINTIFF'S FAILURE TO RESPOND TO THIS ORDER WILL RESULT IN A RECOMMENDATION TO DISMISS FOR FAILURE TO PROSECUTE PURSUANT TO LR 83.3.1." (Doc. 14). Plaintiff did not respond to this Order.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See*

*Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.

1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on April 28, 1967, and was classified as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 35, 76). He has a tenth grade education and past relevant work as a building maintenance manager and a building maintenance supervisor. (Tr. 35, 49-50).

Plaintiff asserts that he became disabled on January 1, 2009. (Tr. 35). On January 21, 2009, Plaintiff presented to the emergency room at Memorial Hospital complaining of chest pain, but he left against medical advice. (Tr. 226). A doctor "tried to reason with [Plaintiff] and he just was not willing to hear anything she had to stay," so he "ripped out his IV" and he left. (Tr. 226, 229).  He reported that "otherwise he has been in normal health" and his exam did not indicate any musculoskeletal problems. (Tr. 235). He had normal strength and his neurologic exam was normal. (Tr. 236, 240). His "tox screen [was] positive for cannabinoids." (Tr. 236). He was assessed to have "chest pain" and "marijuana abuse." (Tr. 237).

On March 2, 2009, Plaintiff was seen at Wheatlyn Family Medicine, his primary care provider, for pain in his left ear. (Tr. 315). In his review of musculoskeletal symptoms, he "denie[d] any problem within category." (Tr. 316).

He did not mention back or beck pain and a musculoskeletal exam was not done. (Tr. 317).

On March 9, 2009, Plaintiff saw Dr. Jennifer Bamford, M.D., at Wheatlyn Family Medicine. (Tr. 319). He reported that he "woke up with pain" three days earlier "on his left side and into his left arm." (Tr. 318). He reported that "trigger point injections in the past…helped." (Tr. 318). He  reported "no weakness in his arms." (Tr. 318). On exam, Plaintiff was "holding [his] head tilted to the right," was "very tender over his spasming muscles on the right side of the neck" and had "good range of motion of his right arm." (Tr. 319).  He received trigger point injections, "tolerated the procedure well and had increased mobility at the end of the procedure." (Tr. 319). She prescribed him 20 Vicodin 500 m.g. for use every six hours as needed. (Tr. 319). On March 24, 2009, X-rays of Plaintiff's cervical spine showed "[c]ongenital fusion of the C2-3 and diffuse degenerative change of the cervical spine without fracture." (Tr. 341, 416).

On March 30, 2009, Plaintiff was evaluated at Orthopaedic and Spine Specialists ("OSS"). Plaintiff reported that he had neck pain for four weeks. (Tr. 292). He also complained of hip pain and radiating pain in his shoulder and elbow. (Tr. 292). On exam, Plaintiff had limited range of motion, but his strength was "good and equal bilaterally" and his "[n]eurosensation [was] intact." (Tr. 294). X-rays of the cervical spine indicated "slight loss of the normal lordotic curve." (Tr.

294). He was prescribed a Medrol Dosepak and scheduled for an MRI. (Tr. 295).

He indicated that he had never had "depression," "anxiety," "mental disease," or

"neuropathy," although he "may be bipolar." (Tr. 296-97).

On April 8, 2009, Plaintiff had an MRI of his cervical spine. (Tr. 312, 342-

43). It indicated:

> Disc bulges and protrusions combined with uncovertebral process
> osteophytes at C5-6 and C6-7 level with severe central canal stenosis
> obliterating the "CSF clef" around the spinal cord, which indicates loss of
> normal functional reserve of the central canal. Associated spinal cord
> impingement. Question small are of spinal cord edema, possibly
> representing mild focal spinal cord compression.

(Tr. 312). It further indicated a "[l]arge right C3-4 uncovertebral process

osteophytes/disc extrusion, with severe stenosis of the right lateral recess and right

intravertebral neural foramina and associated radicular impingement." (Tr. 312). It

indicated a "[p]rominent right C5-6 uncovertebral process osteophytes and

subarticular and right foraminal disc extrusion, obliterating the right intravertebral

neural foramina with radicular impingement," and "[s]evere intravertebral neural

foraminal stenosis also seen at other levels." (Tr. 312).

On April 14, 2009, Plaintiff was evaluated at OSS. (Tr. 292). His reports of

pain were unchanged. (Tr. 292).  However, he denied numbness and tingling in the

fingers. (Tr. 292). Notes indicate: "Work/Functional Status: the [Plaintiff] is able

to ambulate perform activities of daily living without devices. He is unemployed."

(Tr. 292). Plaintiff reported that he could handle his personal care, but it was

"painful" so he was "slow and careful." (Tr. 300). He reported that "[p]ain prevents [him] from lifting heavy weights, but I can manage light to medium weights if they are conveniently positioned." (Tr. 300). He reported that pain does not prevent him from walking ¼ mile, but that it did prevent him from walking a ½ mile. (Tr. 300). He reported that pain does not prevent him from standing for more than thirty minutes, but did prevent him from standing from more than an hour. (Tr. 301). He reported problems sleeping and, although he denied being restricted to his home, he indicated that he does not go out "as often." (Tr. 301). He reported that his pain was "bad, but [he] can manage journeys over two hours." (Tr. 301).

On exam, he had "mild" tenderness, he walked with a "normal gait," his straight leg raise was "negative bilaterally," his strength was "5/5" throughout, his neurology exam was normal, his sensation was "intact," and his reflexes were "intact and symmetric." (Tr. 293). He was prescribed physical therapy, continued on Vicodin, and prescribed Flexeril. (Tr. 293).

On April 23, 2009, Plaintiff presented to the emergency room at Memorial Hospital complaining of chest pain. (Tr. 270). He reported that he "lives with family, smokes marijuana." (Tr. 270). He reported that he had "been stressed a lot because of work-related issues and other social issues." (Tr. 275). He was assessed to have "[a]cute dyspnea, suspect anxiety." (Tr. 276). He denied fatigue. (Tr. 277).

His exam did not indicate any musculoskeletal problems, his back was not tender, and his neurology exam was normal. (Tr. 278).

Plaintiff was treated at Wheatlyn Family Medicine in September, November, and December of 2009 and February of 2010 for sinus pressure and cold symptoms. (Tr. 320-26). He never mentioned back or neck pain and no musculoskeletal exam was done. *Id.* He did not request refills for his Vicodin or Flexeril during this time. (Tr. 320-26).

On August 6, 2010, Plaintiff was evaluated at OSS. (Tr. 290). He reported that his back pain began over the "last day." (Tr. 290). He had tenderness, spasm, and decreased range of motion, but his strength was "good and equal bilaterally," his neurology exam was normal and his "neurosensation [was] intact," and his straight leg raise was negative. (Tr. 290). X-rays of the cervical spine indicated "multilevel disc degeneration, what appears to be almost a Klippel-Feil formation of the upper cervical spine, spinal stenosis" and "mild disc space narrowing on a few levels" but "[n]o acute abnormalities." (Tr. 290). He was prescribed a Medrol Dosepak, Flexeril, and Vicodin. (Tr. 291). On August 11, 2010, Plaintiff followed-up at OSS. (Tr. 288). He had tenderness, spasm, decreased range of motion and a slow and antalgic gait, but no "focus motor weakness," his reflexes were "symmetric and appropriate," and he did not "have any pain with straight leg raise of his lower extremities." (Tr. 288).

On October 20, 2010, Plaintiff followed-up at Wheatlyn Family Medicine. (Tr. 332, 334). On exam, his neck had full range of motion, and there were no musculoskeletal abnormalities noted. (Tr. 330). He was prescribed an NSAID pain reliever, but never picked it up because he felt that it was too expensive. (Tr. 328, 334).  On November 12, 2010, Plaintiff followed-up at Wheatlyn Family Medicine with Dr. Bamford. (Tr. 335). He was having neck pain again, and indicated that he did not want injections because they caused him pain in the past. (Tr. 335). He reported that he was having "flare ups in his neck off and on." (Tr. 333). On exam, he was "[s]omewhat irritable," he "appear[ed] somewhat uncomfortable with movement," and had "decreased range of motion with his neck." (Tr. 334). His strength was "normal." (Tr. 334). He was referred to Wellspan Orthopedic for a second opinion and advised to "remain active in the daytime." (Tr. 333). He reported that he could not afford expensive medications. (Tr. 333).

On January 21, 2011, Plaintiff followed-up with Dr. Bamford complaining of congestion and ear pain. (Tr. 388). Plaintiff reported that his chronic back pain prevented him from doing "any physical activity without having repercussions" and that he was "very frustrated." (Tr. 388). On exam, his neck was "supple" and no musculoskeletal abnormalities were noted. (Tr. 390). An X-ray of his cervical spine indicated "no significant change compared to March 24, 2009." (Tr. 350). His medications were renewed. (Tr. 388).

On April 1, 2011, Plaintiff was seen at Wheatlyn Family Medicine. (Tr. 392). He reported swelling in his hand and a large knot for three months, and explained that he had a "briar" in his hand from the previous December. (Tr. 392). The doctor attempted to remove the "lesion" but "nothing came out except blood." (Tr. 354, 392). He was referred to an orthopedist. (Tr. 394). Later that day, Plaintiff saw Dr. David Scarpelli, M.D., at Wellspan Orthopedic. (Tr. 394). Plaintiff reported that he thought something got "stuck in his hand" while "hunting" the previous December. (Tr. 394). Plaintiff reported that he was "exercising regularly" and "denied any problems" in the "musculo-skeletal" and "psychiatric" categories. (Tr. 396). The foreign body was "excised." (Tr. 394).

On April 19, 2011, Plaintiff followed-up with Dr. Bamford. (Tr. 398). He was "having pain in his mid back that radiates around to the front" that was "not better sitting, laying or standing." (Tr. 398). He was scheduled for additional tests, although he was "reluctant to do injections again as it caused him so much pain the first time." (Tr. 398). On exam, he "walk[ed] slowly" and had "difficulty with positional change" and had a positive straight leg raise. (Tr. 399). He had "normal strength" and "normal reflexes." (Tr. 399). X-rays of Plaintiff's cervical spine indicated "no significant change compared to 3/24/2009." (Tr. 400).

On May 3, 2011, X-rays of Plaintiff's thoracic spine showed a "normal thoracic spine" with "no change compared with 3/6/2007." (Tr. 353, 418). On May

19, 2011, Plaintiff had an MRI of the lumbar spine that was "normal" except for "mild degenerative changes," "mild disc material desiccation," "mild" narrowing of the neural foramina," "minimal disc bulge" and "mild facet arthritis" with "no evidence of compression fracture and "[n]o spinal canal stenosis." (Tr. 351-52, 421-22). An MRI of the cervical spine indicated "mild to moderate degenerative disc disease" with "asymmetric disc bulge," a "prominent uncinate spur," "moderately to severely narrowed bilateral neural foramina and mild spinal canal stenosis," a "diffuse disc bulge," a "prominent complex of disc and bony spur," and a "fusion of C2-C3 vertebrae." (Tr. 348-49, 423-24). An MRI of the thoracic spine indicated "mild degenerative changes of the thoracic spine with osteoarthritis changes at the vertebrocostal junctions" and "minimal marginal osteophytes," "minimal disc material desiccation" but "no evidence of spinal canal stenosis or narrowing of the neural foramina identified at the region where the patient has pain" and the "spinal cord appear[ed] normal." (Tr. 345-47, 419-20).

On May 16, 2011, Plaintiff applied for disability and had a face-to-face interview at the state agency. (Tr. 132). The interviewer observed difficulty in "sitting," "standing," and "walking," explaining that he had "obvious issues with back—could not sit for long periods and had to keep adjusting body for comfort." (Tr. 131).

On June 3, 2011, Plaintiff submitted a Function Report. (Tr. 151). He wrote that he "can't sit, walk or stand for long periods of time" and "can't do any lifting, bending, twisting." (Tr. 144). He reported that he cooks meals for his two sons, cares for his fish, and has no problems caring for his hair, shaving, and feeding himself. (Tr. 145). He indicated that his wife helps him care for the children, that he has difficulty sleeping due to pain, and that it is painful for him to dress, bathe, and sometimes use the toilet. (Tr. 145). He wrote that he spends fifteen minutes to an hour preparing meals a few times a week and also does "light household cleaning" and "washes dishes" a few times a week. (Tr. 146). He indicated that his oldest son sometimes had to finish his chores if he was in too much pain. (Tr. 146). He reported that he leaves his house "almost daily," can drive on his own, and shops in stores "a couple times a month" for "maybe 20 minutes." (Tr. 147). He reported that he goes fishing for "an hour or two" "about twice a month," goes hunting for "an hour or two" "a few times a year," goes hiking "a couple times a year," and grills with his family. (Tr. 148). He indicated problems concentrating, completing tasks, and getting along with others. (Tr. 149). He reported that he needed to use a walking stick "at times" when he was "scouting or hiking." (Tr. 150). He reported that his medications give him side effects and "make [him] sleepy." (Tr. 151). He indicated that he had never attended physical therapy

because he "couldn't afford to" and had never been referred to a psychologist or psychiatrist to cope with pain. (Tr. 153).

On June 10, 2011, Plaintiff was evaluated at Wellspan Neurosurgery by Dr. Joel Winer, M.D. (Tr. 357). He reported neck and back pain that was "grinding, stinging, and aching" and "numbness from the 3rd through 5th fingers bilaterally which extends through the triceps." (Tr. 358). He reported trouble sleeping, having fallen "about four times," pain "radiat[ing] down the sides of his legs into his calves," and that he was unable to mow his lawn with a self-propelled lawn mower. (Tr. 358). He denied smoking and reported that he was "Exercising Regularly" and using a "home program." (Tr. 358-59). On exam, his sensation and reflexes were "intact," his gait was "nonantalgic and device free," and his motor strength was "full" "except for "decreased grip and intrinsic strength bilaterally." (Tr. 361). Dr. Winer ordered an EMG. (Tr. 357).

On June 27, 2011, Plaintiff followed-up at OSS with Dr. K. Nicholas Pandelidis, M.D. (Tr. 373). He "appear[ed] uncomfortable," had a "somewhat depressed affect," "decreased" and "uncomfortable" range of motion in his neck, and "some tenderness but no spasm or deformity." (Tr. 372). He had "no focal motor weakness" and his deep tendon reflexes were "symmetric." (Tr. 372). Plaintiff did "not really have any upper extremity radicular complaints" and Dr. Pandelidis observed that "there is no evidence of radiculopathy." (Tr. 372). Dr.

Pandelidis opined that Plaintiff had "no harmful process occurring and he can work within his pain capacity." (Tr. 373). He further opined that Plaintiff had "no structural impairment that would preclude even heavy work." (Tr. 373).

On July 6, 2011, Dr. Robert J. Balogh, Jr., M.D., reviewed Plaintiff's file and completed a Physical RFC Assessment. (Tr. 367). He noted that Plaintiff's activities of daily living are "somewhat limited," as Plaintiff is "able to do personal care with some pain," "takes care of pets," "prepares meals and does light housework," "drives," "hunts and fishes in a limited fashion," "can lift over 10 pounds but that is painful," and "sometimes uses a walking stick while scouting or hiking." (Tr. 366). He also noted that Plaintiff had been noncompliant with "recommended treatment modalities at times," "did not cooperate with the application process; specifically he did not attend the Scheduled Mental Health Consultation," and had received only "treatment for his pain that was routine and conservative." (Tr. 366). Dr. Balogh cited to Plaintiff's January 2009 emergency room visit when he left against medical advice, his April 2009 emergency room visit when his musculoskeletal exam was normal, Plaintiff's primary care physician's recommendation that he engage in "job retraining" and refrain from "shovel[ing] snow or drag[ging] deer," his primary care physician's notation that he had been hunting, and his generally normal exams with Dr. Winer. (Tr. 366). He opined that Plaintiff could occasionally lift and carry up to twenty pounds,

frequently lift and carry up to ten pounds, sit, stand, or walk for up to six hours each in an eight-hour workday, had no postural limitations, and had no manipulative limitations. (Tr. 369).

On July 11, 2011, Dr. Alex Siegel, Ph.D, reviewed Plaintiff's file. (Tr. 367). She opined that there was insufficient evidence to establish the Paragraph B criteria, explaining that Plaintiff "did not allege any mental impairment," there was "no mental status exam" in the medical records, and Plaintiff did not attend the consultative exam because he "did not feel like going" because he "did not have a mental impairment." (Tr. 367).

On July 14, 2011, Plaintiff's claims for DIB and SSI were denied at the initial level. (Tr. 61). The denial notice stated that the Commissioner "based our determination" on Plaintiff's records from OSS, Wheatlyn, Wellspan and the emergency room visits "because [Plaintiff] did not take the medical examination we asked [Plaintiff] to take at our expense. The examination was needed to fully evaluate your condition." (Tr. 61, 65).

On August 8, 2011, Plaintiff submitted a Disability Appeals Report. (Tr. 176). Plaintiff reports constant pain, stress, and depression. (Tr. 175). He reported that his impairments "slow [him] down." (Tr. 173).

On August 24, 2011, Plaintiff had a follow-up at Wellspan Neurosurgery with Dr. Winer. (Tr. 380). Plaintiff was continuing to report pain and numbness

and tingling in his fingers, but Dr. Winer noted that "the films do not demonstrate any anatomical substrate for" symptoms in his lumbar and thoracic spine. (Tr. 380). He denied smoking and indicated that he was "Exercising Regularly." (Tr. 382). He also reported feelings of sadness, anxiety, worry, and loss of appetite. (Tr. 383). On exam, his "memory concentration language [sic] and fund of knowledge is appropriate," his neck was "supple" but had "reduced range of motion and tilt to the right," his straight leg raise was negative, and he had "full strength" in "all muscle groups." (Tr. 383). His "[s]ensory examination [was] intact to light touch, pinprick, proprioception, graphesthesia and stereognosis, "his "[d]eep tendon reflexes are symmetric, present, without signs of myelopathy," he had "good coordination," and his "ambulatory gait and station are normal." (Tr. 384). He was scheduled for a CT scan. (Tr. 380). On August 25, 2011, a CT scan of Plaintiff's cervical spine indicated "[s]everely narrowed … neural foramen due to bony spur and short pedicle," a "[r]ight C5-C6 lateral recess stenosis due to bony spur from the endplates," a "fusion of the C2-C3," and "[m]ild facet arthritis." (Tr. 386).

On October 20, 2011, Plaintiff followed-up at Wellspan Neurosurgery with Dr. Winer. (Tr. 375). Dr. Winer wrote that Plaintiff was "understandably frustrated" because he did "not understand why someone cant [sic] take his neck apart and make things better." (Tr. 375). Plaintiff reported that he was "unable to cut the grass or stand to the dishes without having pain in his neck." (Tr. 375).

Plaintiff also reported that "pain and grinding in his neck than transmits electrical activity and numbness and tingling to both hands" but Dr. Winer "explained to him electrical studies do not point towards nerve involvement or possibly fibromyalgia." (Tr. 375). He noted that Plaintiff's EMG and nerve conduction study were "negative." (Tr. 376). On exam, his "memory concentration language [sic] and fund of knowledge is appropriate," his neck was "supple" but had "reduced range of motion and tilt to the right," his straight leg raise was negative, and he had "full strength" in "all muscle groups." (Tr. 379). His "[s]ensory examination [was] intact to light touch, pinprick, proprioception, graphesthesia and stereognosis," his "[d]eep tendon reflexes are symmetric, present, without signs of myelopathy," he had "good coordination," and his  "ambulatory gait and station are normal." (Tr. 379). He was referred for consultation with specialists. (Tr. 375).

On November 30, 2011, Plaintiff followed-up at Wheatlyn Family Medicine with Dr. Lavanya Karri, M.D. (Tr. 401). He was complaining of a cough and diagnosed with acute bronchitis with bronchospasm. (Tr. 401). Plaintiff was "upset" when Dr. Karri was "unable to give him the prices of different medicines and antibiotics as per…our network guidelines." (Tr. 401). He was "request[ing] refill for hydrocodone." (Tr. 401). He denied "numbness/tingling" and "weakness" and, for "muscles and joints," he "denie[d] any problems within category." (Tr. 403). His neck was "supple." (Tr. 404).

On February 21, 2012, Plaintiff followed-up at Wheatlyn Family Medicine with Dr. Bamford. (Tr. 405). He had decreased range of motion in his neck. (Tr. 408). He "refused further antidepressants" and "discussed possible use of Cymbalta but that it was expensive." (Tr. 405). He was "recommended follow up with Dr. Bernal, he is not sure he can afford the gas." (Tr. 405). They also "discussed how [Dr. Bamford]  prefers that he use the Naprosyn twice daily and Vicodin for flares as opposed to the other way around." (Tr. 405). Plaintiff had "stopped his citalopram" because it was "making him feel tired, yawning all the time." (Tr. 405). He was "still [having] ups and downs" but he felt "better off of the citalopram." (Tr. 405). It was noted that he "tends to have anger issues." (Tr. 405). He "denied side effects" from his medications. (Tr. 405). He had "not yet had drug testing done" but was "attempting to get Social Security Disability because he has difficulty sitting for long periods of time." (Tr. 405).

On May 14, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 30). Plaintiff testified that he has difficulty turning his head back and has to limit his driving. (Tr. 37). He testified that his numbness and tingling in his arms and fingers makes it difficult to pick up change, button himself, or use zippers. (Tr. 38). He testified that he needs help tying his shoes and dressing himself. (Tr. 39). He testified that he had not done any outside work or snow removal "since [he] got hurt." (Tr. 40). His ability to vacuum is "limited." (Tr. 40). He testified that he only

gets his pain medication "when [he] can" because he cannot afford them. (Tr. 41). He testified that he gets "very bad side effects" from his medication, such as constipation and fatigue. (Tr. 42). He testified that he generally only lives on the first floor of his home. (Tr. 42). He testified that he had not been fishing or hunting since the previous year, and that he could only do either for twenty to thirty minutes. (Tr. 44). He testified that he had tried physical therapy, but it had been unsuccessful. (Tr. 45). Plaintiff denied that he had ever missed a consultative exam. (Tr. 48).

A VE also appeared and testified. (Tr. 50). Given the RFC assessed by the ALJ as described below, the VE testified that Plaintiff could not perform his past relevant work, but could perform other work in the national economy, in positions like a fast-food worker, a cashier, and a light hand-packager, all unskilled positions. (Tr. 50). The VE also testified that if Plaintiff were limited to sedentary work, with the same postural and manipulative restrictions, he could perform other work in a position like an eyeglass frame polisher. (Tr. 51).

On June 25, 2012, Plaintiff had a consultative exam with Dr. Anthony Fischetto, Ed.D. (Tr. 446). Plaintiff stated he was unemployed because of physical problems "[j]ust from working hard all [his] life." (Tr. 446). He reported being hospitalized "[a] long time ago" after "he sliced his own wrist" when "two guys were going to attack him." (Tr. 446). Plaintiff reported he "never was on any

medications for nerves or depression. He never saw a psychiatrist." (Tr. 446).
Plaintiff said "he smoked marijuana 10 years ago." (Tr. 446).

On exam, his thought was "[g]oal-directed, he had no major preoccupations
or delusions, his abstract thinking was "[g]ood for similarities," his information
and intelligence was "[a]verage for [the] general fund of knowledge," and his
memory was "good." (Tr. 449). He was "[s]low for serial sevens" and had poor
impulse control and social judgment "with getting into fights." (Tr. 449). His test
judgment was "poor" and his insight and reliability were "limited." (Tr. 449). He
was diagnosed with "mood disorder, [not otherwise specified]," alcohol abuse
history, and "personality disorder, [not otherwise specified.]" (Tr. 449). However,
Dr. Fischetto assessed a GAF of 60[1] and opined that his prognosis was "fair." (Tr.
450). He opined that Plaintiff's concentration was "a little slow." (Tr. 450). He

---

[1] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014)
("The GAF score allows a clinician to indicate his judgment of a person's overall psychological,
social and occupational functioning, in order to assess the person's mental health illness.
*Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set
within a particular range if either the symptom severity or the level of functioning falls within
that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF
rating is the single value that best reflects the individual's overall functioning at the time of
examination. The rating, however, has two components: (1) symptom severity and (2) social and
occupational functioning. The GAF is within a particular range if *either* the symptom severity *or*
the social and occupational level of functioning falls within that range. When the individual's
symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the
two. …. A GAF score of 31–40 represents some impairment in reality testing or communication
or major impairment in several areas, such as work or school, family relations, judgment,
thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents
moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*
A GAF score of 61 to 70 represents mild symptoms…").

opined that Plaintiff had "slight" limitations in understanding, remembering, and carrying out simple instructions, and interacting appropriately with the public, supervisors, and coworkers. (Tr. 444). He opined that Plaintiff had moderate limitations in carrying out detailed instructions, making judgments on simple work related decisions, responding appropriately to work pressures in a usual work setting, and responding appropriately to change in a routine work setting. (Tr. 444). He based these findings on Plaintiff's history of alcohol use ("ETOH"), reports of anger, screaming, depression, and anxiety, and his "slow" concentration. (Tr. 444).

On June 26, 2012, Plaintiff was evaluated by Dr. Bruce Goodman, M.D. (Tr. 426). Dr. Goodman acknowledged that Plaintiff complained of an "inability to sit, walk or stand for long periods of time, and the necessity of avoiding lifting, bending, and twisting. (Tr. 426). On exam, Plaintiff had tenderness and discomfort to "almost imperceptible" palpation, muscle spasm, and flattening of normal lordosis. (Tr. 430). However, he had full range of motion and all of his reflexes were "intact." (Tr. 430). He had "5/5" strength, no atrophy, and a negative straight leg raise. (Tr. 430). Dr. Goodman noted that he "complain[ed] of discomfort in terms of having pins and needles in the fourth and fifth fingers" and had "a positive Tinel's test with palpation of both elbows compatible with ulnar neuritis emanating at the elbow." (Tr. 431). Dr. Goodman noted that he "would strongly suggest he have a psychiatric evaluation prior to any type of employment status." (Tr. 431).

He opined that Plaintiff was limited in his ability to "push/pull" due to his ulnar neuritis, but was not limited in his ability to feel, handle, or reach. (Tr. 432). He opined that Plaintiff should avoid fumes, chemicals, moving machinery and heights. (Tr. 432). He opined that Plaintiff could lift and carry up to ten pounds frequently and up to twenty pounds occasionally. (Tr. 433). He opined that Plaintiff could only sit for one hour at a time and could only stand or walk for thirty minutes at a time. (Tr. 435). He opined that Plaintiff could only sit for four hours out of an eight-hour workday and could only sit and stand for thirty minutes out of an eight hour workday. (Tr. 435). He opined that Plaintiff could not handle, finger, feel, push or pull for more than 1/3 of a workday and could not reach for more than 2/3 of a workday. (Tr. 435). He opined that Plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 437). However, he also opined that Plaintiff could occasionally kneel, crouch and stoop. (Tr. 429). He opined that Plaintiff could "perform activities like shopping," "travel without a companion for assistance," "ambulate using a wheelchair, walker, or 2 canes and 2 crutches," "walk a block at a reasonable pace on rough or uneven sources," "use standard public transportation,", "climb a few steps at a reasonable pace with the use of a single hand rail," "prepare a simple meal and feed himself/herself," "care for [his] personal hygiene," and "sort, handle or use paper/files." (Tr. 439).

On August 28, 2012, the ALJ issued the decision. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. (Tr. 15). At step two, the ALJ found that Plaintiff's degenerative disc disease and ulnar neuritis were medically determinable and severe. (Tr. 15). The ALJ determined that Plaintiff's mental impairments were non-severe. (Tr. 16-17). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 17-18). The ALJ found that Plaintiff had the RFC to perform light work, but cannot climb ladders, ropes, or scaffolds and can only frequently balance, stoop, kneel, crouch, crawl, handle, and finger. (Tr. 18). At step four, the ALJ found that Plaintiff cannot perform his past relevant work. (Tr. 23). At step five, the ALJ found that Plaintiff could perform other work in the national economy, and was not disabled pursuant to the Act. (Tr. 24).

## VI.    Plaintiff Allegations of Error

### A.    Listings Assessment

Plaintiff asserts that he met or equaled a Listing. A claimant must establish each element of a Listing to meet a Listing. 20 C.F.R. § 404.1525(d) ("To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies *all of the criteria in the listing*.") (emphasis added). As the Third Circuit has explained:

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some

> of those criteria, no matter how severely, does not qualify." *Zebley,* 110
> S.Ct. at 891 (emphasis in original). "For a claimant to qualify for benefits by
> showing that his unlisted impairment, or combination of impairments, is
> 'equivalent' to a listed impairment, he must present medical findings equal
> in severity to *all* the criteria for the one most similar listed impairment." *Id.*
> (emphasis in original).

*Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Thus, if there is one

element that is not satisfied, the ALJ will have substantial evidence to conclude

that a claimant does not meet a Listing. *Id*.

Plaintiff asserts that he meets Listing 1.04A and 1.04B. One of the

requirements of 1.04A is "muscle weakness" that is "accompanied by sensory or

reflex loss." 20 C.F.R. pt. 404, subpt. P, app., Listing 1.04. Plaintiff has not alleged

muscle weakness that is accompanied by sensory or reflex loss. (Pl. Brief at 1-12).

Plaintiff had full muscle strength in every medical visit except for June of 2011,

when Dr. Winer observed decreased grip strength. (Tr. 236, 240, 288, 290, 294,

318, 334, 361, 372, 399, 403, 430). However, Dr. Winer would subsequently

observe full strength. (Tr. 375, 383). Moreover, there is no evidence that Plaintiff's

decreased grip strength in June of 2011 was "accompanied by sensory or reflex

loss." In every physical examination, Plaintiff's sensation and reflexes were

normal. (Tr. 236, 240, 278, 288, 290, 294, 361, 372, 399, 403, 430). Similarly, a

requirement of Listing 1.04B is spinal arachnoiditis. 20 C.F.R. pt. 404, subpt. P,

app., Listing 1.04. Plaintiff has not alleged a diagnosis of spinal arachnoiditis.

Thus, the ALJ had substantial evidence to conclude that Plaintiff did not meet

Listing 1.04A or 1.04B. *Brauer v. Astrue*, 2:11-CV-141, 2012 WL 1379314, at *6 (D. Vt. Apr. 20, 2012)("There is also no medical evidence demonstrating that Brauer suffered from: 'motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss,' as required by Listing 1.04A; or '[s]pinal arachnoiditis ... resulting in the need for changes in position or posture more than once every 2 hours,' as required by Listing 1.04B. 20 C.F.R. pt. 404, subpt. P, app., Listing 1.04. Therefore, the evidence does not support a finding that Brauer met the requirements of Listing 1.04 during the alleged disability period.").

Plaintiff asserts that he meets "Listing" 11.00(C). However, Section 11.00(C) is not a Listing. It is a definition for a phrase used in various Listings. 20 C.F.R. pt. 404, subpt. P, app., Section 11.00(C). The only Listings in Section 11 are Listings 11.02 through 11.19. 20 C.F.R. pt. 404, subpt. P, app., Section 11.00. Plaintiff has never alleged that he has any of the requisite diagnoses for most of these Listings.[2] The ALJ specifically referenced Listing 11.04B, which requires meeting the definition of 11.00(C) along with having a diagnosis of being status post-central nervous system vascular accident for at least three months. (Tr. 22); 20

---

[2] To meet a Listing in Section 11, a claimant must have one of the following diagnoses: epilepsy, central nervous system vascular accident, benign brain tumor, Parkinsonian syndrome, cerebral palsy, spinal cord or nerve root lesions, multiple sclerosis, Amyotrophic lateral sclerosis, Anterior poliomyelitis, Myasthenia gravis, Muscular dystrophy, peripheral neuropathies, subacute combined cord degeneration (pernicious anemia), degenerative disease not listed elsewhere, cerebral trauma, or syringomyelia. 20 C.F.R. pt. 404, subpt. P, app., Section 11.

C.F.R. pt. 404, subpt. P, app., Listing 11.04B. Plaintiff has never alleged that he had a central nervous system vascular accident. (Pl. Brief at 10-12).   None of the medical records indicate a central nervous system vascular accident. *See Section V, supra.*   The ALJ did not find a central nervous system vascular accident to be medically determinable at step two. (Tr. 15). Plaintiff has not challenged the ALJ's step two finding, and an impairment that is not found to be medically determinable may not be considered in the Listing Assessment. 20 C.F.R. §§ 416.908, 416.923; *see also Rutherford v. Barnhart*, 399 F.3d 546, 554, n.7 (3d Cir. 2005) (to be considered, an impairment must be medically determinable, but need not be "severe"). So, even if he met 11.00(C), he would not meet Listing 11.04.

The only possible relevant Listing is Listing 11.14, which requires "[p]eripheral neuropathies. With disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app., Listing 11.14. Plaintiff has not alleged that any persistent disorganization of motor function has persisted "in spite of prescribed treatment." In contrast, the ALJ found that Plaintiff's condition improved with treatment. (Tr.20). The ALJ also found that Plaintiff filed for disability "without an adequate time to assess his response to treatment." (Tr. 20-21). Plaintiff has not challenged these findings, and cannot establish that his peripheral neuropathy and associated symptoms persisted "in spite of prescribed treatment."

Regardless, disorganization of motor function within the meaning of the definition in 11.00C requires a claimant to demonstrate at least one of the following: "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances." 20 C.F.R. pt. 404, subpt. P, app., Section11.00(C). Plaintiff has never alleged that he suffers paresis, paralysis, tremor, involuntary movements, or ataxia.  (Pl. Brief at 1-12). As discussed above, there is no medical evidence of sensory disturbance anywhere in the file. There is no objective evidence of Plaintiff's alleged inability to walk, and the ALJ appropriately found his subjective claims to lack credibility, as discussed below. Plaintiff's muscle spasm is insufficient to qualify as an involuntary movement pursuant to this Listing, because "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." 20 C.F.R. pt. 404, subpt. P, app., Section11.00(C). There is no evidence that Plaintiff's muscle spasm causes any interference with location or the use of fingers, hands, and arms. *Id.* Thus, Plaintiff has failed to demonstrate "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances."  *Id.*; *Scuderi v. Comm'r of Soc. Sec.*, 302 Fed.Appx. 88, 90 (3d Cir. 2008) ("The ALJ's decision reflects adequate consideration of the "disorganization of motor function" requirement of Listing 11.19B, despite the fact that that specific Listing is not highlighted. The ALJ reviewed all of the medical evidence and accurately

concluded from the opinions of Drs. Anthony Frempong–Boadu and Richard Siegfried that, except for decreased fine finger movements in his left hand and decreased sensation in his left upper extremity, Scuderi has normal motor, sensory, and reflex functions in the lower and upper extremities. The ALJ also noted that Scuderi reports being able to drive when necessary and perform housekeeping tasks including meal preparation, vacuuming, and shopping."). Consequently, the ALJ had substantial evidence to conclude that Plaintiff did not have persistent disorganization of motor function as defined by Section 11.00C and did not meet any of the Listings in Section 11.

Plaintiff argues that he meets Listing 12.04, which requires a diagnosis of a mood disorder that results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked restriction in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04(A). A marked limitation is one that "interfere[s] seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1,Section 12.00(C).

Plaintiff has not asserted that any limitation in daily living, social functioning, or concentration, persistence, or pace "interferes seriously" with his ability to function, and has not alleged that he suffered any episodes of

decompensation. (Pl. Brief at 6-8).  Plaintiff cites to diagnoses of mood disorders from his primary care physician, but diagnoses are relevant to the Paragraph A, not Paragraph B, criteria.   20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04. At most, Plaintiff asserts that he has "some" difficulty concentrating and "slow" concentration skills and "poor" social judgment.  (Pl. Brief at 8-9). However, these observations were recorded by Dr. Fischetto, who opined that Plaintiff did not meet Listing 12.04. (Pl. Brief at 7-9). The only mental status exam in the record was Dr. Fischetto's. As the ALJ noted, Plaintiff has not received any specialized mental health treatment and was noncompliant with mental health treatment recommendations. (Tr. 21-23). As a result, the ALJ had substantial evidence to conclude that Plaintiff had failed to produce sufficient medical evidence of the Paragraph B criteria, and therefore could not meet Listing 12.04.

## B.    RFC Assessment

Plaintiff asserts, in a conclusory manner, that the ALJ's RFC finding lacked substantial evidence. Specifically, Plaintiff contends only that:

> The ALJ erred when he concluded that Claimant has a residual functional capacity to perform sedentary-duty work. The ALJ noted, but failed to objectively analyze, evidence that clearly shows Claimant cannot function in a work environment. Claimant testified that he has pain with motion and complains of a 'crunching' feeling in his neck. He also has testified that he has extreme difficulty sitting or standing for periods longer than twenty minutes. Medical records support that he has a decreased range of motion in his neck that causes discomfort.

> James Green, a vocational expert, testified that a person who could not lift more than ten pounds regularly during the course of their day would be limited to sedentary work. He also testified that in the event a person could not look down due to a neck fusion, that person would be considered "unemployable." Based on the vocational expert's testimony, Claimant would likely be considered unemployable by not only the expert, but by many others in the job field. Therefore, this Court should find that Claimant does not have a residual work capacity.

(Pl. Brief at 12). Plaintiff also generally asserts that Plaintiff is "limited [in] his ability to engage in house work or play with his kids," that he has "exertional limitations," that he cannot climb stairs, climb ladders, kneel, crouch, or stoop, that he has difficulty sleeping, and that he has numbness that affects his ability to "handle, pinch, and feel." (Pl. Brief at 1-11).

Plaintiff does not develop any of these arguments further. Thus, they are waived. Local Rule 83.40.4(b) requires that in social security cases, a Plaintiff's brief "shall set forth . . . the specific errors committed at the administrative level which entitle plaintiff to relief."   M.D. Pa. Local Rule 83.40.1.   Local Rule 83.40.4(b) elaborates that "[a] general argument that the findings of the administrative law judge are not supported by substantial evidence is not sufficient."   *Id.*; *cf. Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008) (explaining that Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a 'showing,' rather than a blanket assertion, of entitlement to relief and, as a threshold requirement, the plain statement of pleadings must possess enough heft to show that the pleader is entitled to relief).  Failure to adequately raise an issue

results in its waiver. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.,* 44 F.3d 1194, 1203–04 (3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue). Thus, the Court declines any invitation to mine the record to make Plaintiff's case. *Cf. Crawford v. Washington*, 541 U.S. 36, 68 (2004) (declining to "mine the record" in order to support party's case). However, out of an abundance of caution, the Court will address the specific limitations and abilities assessed by the ALJ that Plaintiff challenges.

Plaintiff appears to challenge the ALJ's findings regarding his postural limitations, his range of motion, and his ability to handle, finger, sit, stand, and lift. The ALJ found that Plaintiff could "frequently" engage in most postural limitations, handle, and finger. (Tr. 18).  "'Frequent' means occurring from one-third to two-thirds of the time." SSR 83-10. The ALJ also found that Plaintiff could perform the "exertional demands of light work," which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10. Thus, Plaintiff is asserting that the ALJ lacked substantial evidence to

conclude that he could balance, stoop, kneel, crouch, crawl, handle, finger, stand, and walk for up to 2/3 of the day and lift up to twenty pounds.

Although Plaintiff produced objective evidence that he suffers from severe impairments, such as muscle spasm, decreased range of motion, and degenerative changes in his cervical spine, he did not produce objective evidence of the "intensity, persistence, and limiting effects" of the symptoms caused by these impairments. Even with regard to range of motion, Plaintiff's range of motion was only generically described as "decreased." *See, supra*.   As a result, the only evidence that Plaintiff would be unable to lift up to twenty pounds or perform the above-described activities up to 2/3 of the day was Plaintiff's subjective testimony. This required the ALJ to make a credibility assessment.

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P.[3] Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make

---

[3]"Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" *Sullivan v. Zebley*, 493 U.S. 521, 547, 110 S.Ct. 885, 900, 107 L.Ed.2d 967 (1990) (internal citations omitted).

> a finding on the credibility of the individual's statements based on a
> consideration of the entire case record.

SSR 96-7P; *See also* 20 C.F.R. § 416.929. "One strong indication of the credibility

of an individual's statements is their consistency, both internally and with other

information in the case record." SSR 96-7P. "The individual's statements may be

less credible if the level or frequency of treatment is inconsistent with the level of

complaints, or if the medical reports or records show that the individual is not

following the treatment as prescribed and there are no good reasons for this

failure." *Id.* ALJs may also consider a claimant's "daily activities" and "other

factors." *Id.*

Courts afford deference to an ALJ's credibility assessment, because the ALJ

is in a better position to assess credibility:

> [T]he administrative law judge was not required to accept Napoli's claims
> regarding her physical limitations. *See Van Horn v. Schweiker,* 717 F.2d
> 871, 873 (3d Cir.1983) (providing that credibility determinations as to a
> claimant's testimony regarding the claimant's limitations are for the
> administrative law judge to make). It is well-established that "an
> [administrative law judge's] findings based on the credibility of the applicant
> are to be accorded great weight and deference, particularly since [the
> administrative law judge] is charged with the duty of the applicant are to be
> accorded great weight and deference, particularly since [the administrative
> law judge] is charged with the duty of observing a witness's demeanor ...."
> *Walters v. Commissioner of Social observing a Sec.,* 127 f.3d 525, 531 (6th
> Cir.1997); *see also Casias v. Secretary of Health & Human Servs.,* 933 F.2d
> 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the
> individual optimally positioned to observe and assess the witness
> credibility."). Because the administrative law judge observed and heard
> Napoli testify, the administrative law judge is the one best suited to assess
> her credibility.

*Napoli v. Colvin*, No. 3:13-CV-01815, 2014 WL 2808603, at *11 (M.D. Pa. June 20, 2014) (Jones, J.).

Here, the ALJ found that Plaintiff's claims were internally inconsistent, contradicted by the objective medical evidence, contradicted by Plaintiff's conservative treatment, contradicted by Plaintiff's activities of daily living, and contradicted by his work history.  (Tr. 22). Specifically, the ALJ notes that Plaintiff "did not complain of persistent musculoskeletal pain to a medical source at any time between April 2009 and August 2010." (Tr. 22). The ALJ also found that Plaintiff's complaints were "less probative" in May of 2011 "given the limited treatment at that time." (Tr. 21).

This is an accurate characterization of the record. Plaintiff testified that he became disabled on January 1, 2009. (Tr. 35). However, Plaintiff had no complaints of musculoskeletal pain and specifically denied musculoskeletal problems in medical records from January 21, 2009 and March 2, 2009. (Tr. 226-240, 315-17). On March 9, 2009, he reported that his pain had only begun "three days earlier." (Tr. 318). Plaintiff complained of pain in visits in March and April of 2009. (Tr. 292-301, 318-19).  However, in April of 2009, he reported that he was able to walk between a quarter mile and a half a mile, could stand from thirty to sixty minutes, could lift medium and heavy weights, and could travel on journeys of more than two hours. (Tr. 300-01). He was also able to "ambulate [and] perform

activities of daily living without devices." (Tr. 292). In emergency room and primary care visits on April 23, 2009, September 17, 2009, November 25, 2009, December 29, 2009, and February 18, 2010, Plaintiff never mentions neck or back pain, upper extremity problems, or other musculoskeletal problems and no musculoskeletal abnormalities are noted. (Tr. 270-78, 320-26). He did not complain again of musculoskeletal pain until August 6, 2010, when he reported that his pain began over the "last day." (Tr. 290-91). In other words, over a sixteen month period from April 2009 to August of 2010, the record shows that Plaintiff never complained of musculoskeletal pain and no musculoskeletal problems were noted, despite treatment for other conditions. *Id.*[4] The ALJ properly found that this contradicted Plaintiff's claims that debilitating neck and back pain had rendered him disabled since January of 2009.

The ALJ also accurately concluded that Plaintiff's treatment remained limited through May of 2011. (Tr. 21). Musculoskeletal abnormalities were noted in various medical records from August of 2010 to November of 2010, but by December of 2010, he was able to hunt, and by January 11, 2011, there were no musculoskeletal abnormalities on examination. (Tr. 288-91, 332-34, 390). At Plaintiff's next medical examination, in April of 2011, he "denied" having any

---

[4] The ALJ acknowledged Plaintiff's claims that it was not always feasible for him to afford treatment, in accordance with SSR 96-7p. (Tr. 19). However, the ALJ emphasized that Plaintiff never complained of pain during his gap in treatment, despite being treated for other conditions, which supports the inference that Plaintiff's conservative treatment demonstrated an absence of pain symptoms, not an inability to afford treatment. (Tr. 20).

musculoskeletal or psychiatric problems. (Tr. 396). Despite reporting symptoms through June of 2011, Plaintiff's treating physician opined on June 27, 2011 that Plaintiff "can work within his pain capacity," and had "no structural impairment that would preclude even heavy work." (Tr. 373).

Plaintiff's treatment remained limited through the remainder of the relevant period until the ALJ's decision date. The medical record shows that in July, 2011, two state agency physicians reviewed Plaintiff's file and concluded that he could work despite his impairments. (Tr. 367, 369).  He was treated by Dr. Winer in August and October of 2011, but Dr. Winer observed no abnormalities on physical exam except reduced range of motion in his neck and did not recommend further treatment. (Tr. 375, 380). In November of 2011, he was treated by his primary care physician for a cough, and he "denied any problems" with his "muscles and joints" and "denied" having any "numbness/tingling" or "weakness." (Tr. 404). At a follow-up at his primary care physician in February of 2012, Plaintiff had no musculoskeletal problems noted on exam. (Tr. 408). Throughout this period, he was treated only with a stable dose of a muscle relaxant and a decreasing dose of Vicodin.[5] (Tr. 375, 380, 404, 408).  This is inconsistent with a disability onset of January 1, 2009.

---

[5] In November of 2011, Plaintiff was prescribed 500 mg of Vicodin up to four times per day, but by February of 2012, it had been decreased to only twice per day. (Tr. 403, 405).

Multiple other internal inconsistencies are documented throughout the record. For instance, at the hearing, Plaintiff reported that he had not done any snow removal "since he got hurt." (Tr. 40). This is contradicted by his reports in medical records from January of 2011 that he was shoveling snow and hauling deer. (Tr. 388). He reported in his Function Report that he had never attended physical therapy, but testified before the ALJ that had attended physical therapy, and it had not been helpful. (Tr. 45, 153). He reported in his Function Report that he could hunt and fish for up to two hours, but testified before the ALJ that he could only do either for up to thirty minutes. (Tr. 44, 153). The ALJ noted that Plaintiff "did not report any side effects" which was "contrary to his hearing testimony." (Tr. 21, 405). Plaintiff reported to Dr. Fischetto in 2012 that he had last smoked marijuana "ten years ago," but he had reported in April of 2009 that he "smokes marijuana" and had tested positive for cannabinoids three months earlier. (Tr. 236-37, 270, 446). Plaintiff's inconsistent claims make his subjective testimony less credible. *See* SSR 96-7p.

The ALJ cited several other medical records that demonstrated Plaintiff's testimony was inconsistent with other evidence. Specifically, with regard to handling and fingering, the ALJ noted that Dr. Winer found that there was "no evidence of radiculopathy." (Tr. 373). Both state agency physicians opined that Plaintiff was not limited in his ability to finger, handle, or reach. (Tr. 369, 432).

The ALJ further relied on Plaintiff's treating physicians' opinions that he should pursue "job retraining" and could perform "heavy work." (Tr. 22, 373, 388). Both state agency physicians opined that Plaintiff could lift up to twenty pounds. (Tr. 369, 432).

The ALJ found that Plaintiff's activities of daily living contradicted his claims of debilitating pain. (Tr. 23).  With regard to handling and fingering, the ALJ explained that Plaintiff was able to care for his hair, shave, and feed himself without incident. (Tr. 23). With regard to sitting and standing, the ALJ noted that Plaintiff continued to drive, fish twice per month, hunt on occasion, and grill outside with his family. (Tr. 23). This is an accurate characterization of the record. (Tr. 30-58, 142-53).

The ALJ also considered Plaintiff's work history, and concluded that it rendered his testimony less credible. The ALJ wrote that "[o]ver the last fifteen years, the claimant's longest period of uninterrupted work did not extend beyond sixteen months. From 2002 to 2008, the claimant jumped from job to job." (Tr. 22). This is an accurate characterization of the record. In Plaintiff's work history report, he indicated "not sure (many jobs)" and identified only two positions where he worked from 2001 to 2003. (Tr. 154). Plaintiff also indicated he "can't remember when last worked" and that he was "not sure when last employed. It's been probably a couple years?" (Tr. 177, 194). An ALJ may consider a claimant's

work history in determining whether he is disabled. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979).

The ALJ properly relied on Plaintiff's internally inconsistent claims, medical evidence that contradicted Plaintiff's claims, Plaintiff's conservative (and, at times, nonexistent) treatment, Plaintiff's activities of daily living, and work history in assessing his credibility. See SSR 96-7p.  A reasonable mind might accept this as adequate to conclude that Plaintiff was not credible. Plaintiff did not produce any evidence beyond his subjective testimony that he had more severe limitations than assessed by the ALJ. As a result, substantial evidence supports the ALJ's RFC. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Even if the ALJ's RFC lacked substantial evidence for Plaintiff's postural, range of motion limitations, and social limitations, any error by the ALJ in failing to assess them was harmless because jobs identified by the ALJ and VE do not require those abilities. For instance, the vocational expert also testified that Plaintiff could perform work as a polisher of eyeglass frames.  (DICOT 713.684-038). The Dictionary of Occupational Titles explains that this position has the following requirements:

> People: 8 - Taking Instructions-Helping
> N - Not Significant
> …
> R: Performing REPETITIVE or short-cycle work
> Climbing: Not Present - Activity or condition does not exist
> Balancing: Not Present - Activity or condition does not exist

Stooping: Not Present - Activity or condition does not exist
Kneeling: Not Present - Activity or condition does not exist
Crouching: Not Present - Activity or condition does not exist
Crawling: Not Present - Activity or condition does not exist
…
Talking: Not Present - Activity or condition does not exist
Hearing: Not Present - Activity or condition does not exist

*Id.* at 713.684-038 POLISHER, EYEGLASS FRAMES.

Thus, with regard to climbing, balancing, stooping, kneeling, crouching, and crawling, the VE identified a job (eyeglass frame polisher) that never requires balancing, stooping, kneeling, crouching, and crawling. *Id.* With regard to limited range of motion in the neck, the VE specifically testified that the jobs identified in his testimony could be performed even when a claimant was limited to only "occasionally look[ing] from side to side." (Tr. 55). Consequently, any error in failing to assess additional range of motion or postural limitations is harmless, because the VE identified a position that would not require Plaintiff to move his neck from side to side more than occasionally or to perform postural movements. *See Rochek v. Colvin*, 2:12–CV–01307, 2013 WL 4648340 at *12 (W.D.Pa. Aug.23, 2013) ("A] number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT"); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (Remand is not appropriate where ALJ's error does not affect the

ultimate outcome); 28 U.S.C.A. § 2111 ("[T]he court shall give judgment after an

examination of the record without regard to errors or defects which do not affect

the substantial rights of the parties.").

This position also demonstrates that any failure to assess social limitations

was harmless. The "People" Code for an eyeglass frame polisher is "8." DICOT

713.684-038. Courts have held that claimants can perform positions with a

"People" code of "8" even when assessed with social limitations:

> [T]he descriptions of both loader of semi-conductor dies and touch-up
> screener do not mention dealing with people and identify the presence of
> taking instructions from and helping people in a "Not Significant" amount.
> *Id.* §§ 726.684–110, 726.687–030. Thus, inclusion of a limitation to
> occasional, brief, and superficial contact with coworkers and supervisors in
> the administrative law judge's hypothetical question would not have
> excluded two of the three jobs on which the administrative law judge relied,
> and any error in omitting that limitation from the question and from the RFC
> can only have been harmless. *See, e.g.,*

*Shorey v. Astrue,* 1:11–CV–414–JAW, 2012 WL 3475790 at *6 (D.Me. July 13,

2012) aff'd, 1:11–CV–00414–JAW, 2012 WL 3477707 (D.Me. Aug.14, 2012)

(citing *Larsen v. Astrue,* No. 1:10–CV–00936–JLT, 2011 WL 3359676, at *15

(E.D.Cal. Aug.3, 2011) (jobs with "not significant" level of interaction in DOT

appropriate for claimants with RFC specifying limited or occasional coworker

contact); *Arsenault v. Astrue,* Civil No. 08–269–P–H, 2009 WL 982225, at *3

(D.Me. Apr.12, 2009) (and cases cited therein)); *see also Sweeney v. Colvin*, 3:13-

CV-02233-GBC, 2014 WL 4294507, at *17 (M.D. Pa. Aug. 28, 2014) (collecting

cases). Similarly, this position never requires Plaintiff to talk to others or to "hear" from others. DICOT 713.684-038.  Because the ALJ identified a job that Plaintiff could perform despite social limitations, any error by the ALJ in failing to assess social limitations was harmless.

Similarly, although Dr. Fischetto assessed Plaintiff to have limitations in making judgments and adapting to change at the workplace, the ALJ did not include any of these limitations in the RFC. The ALJ assigned less weight to these limitations because they were based on Plaintiff's non-credible subjective claims, and Plaintiff has not challenged the assignment of weight to the medical opinions. (Tr. 22). Regardless, even if this was an error, an eyeglass frame polisher does not need to make judgments, adapt to change at the workplace, or work effectively under stress.   One aspect of the DOT job descriptions is the identification of "factor[s] designated as 'Temperaments' which, in turn, consists of eleven separately-identified components." *Gaspard v. Soc. Sec. Admin. Com'r,* 609 F.Supp.2d 607, 614 (E.D.Tex.2009) (citing U.S. Dep't of Labor (1991). *Revised Handbook for Analyzing Jobs.* Washington, DC: Government Printing Office). For instance, the Court in *Gaspard* explained that:

> The 11 Temperament factors identified for use in job analysis are:
>
> D–DIRECTING, Controlling, or planning activities of others.
> R–Performing REPETITIVE or short-cycle work.
> I–INFLUENCING people in their opinions, attitudes, and judgments.
> V–Performing a VARIETY of duties.

> E–EXPRESSING personal feelings.
> A–Working ALONE or apart in physical isolation from others.
> S–Performing effectively under STRESS.
> T–Attaining precise set limits, TOLERANCES, and standards.
> U–Working UNDER specific instructions.
> P–Dealing with PEOPLE.
> J–Making JUDGMENTS and decisions.

*Gaspard v. Soc. Sec. Admin. Com'r,* 609 F.Supp.2d 607, 620 (E. D.Tex. 2009)

(citing U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs 10–1 (1991)).

An eyeglass frame cleaner has only a Temperament factor of "R," which is defined

as "performing a few routine and uninvolved tasks over and over again according

to set procedures, sequence, or pace with little opportunity for diversion or

interruption." *Gaspard v. Soc. Sec. Admin. Com'r,* 609 F.Supp.2d 607, 615

(E.D.Tex.2009) (citing U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs

10–2 (1991)); DICOT 713.684-038.   It does not require "V—Performing a

VARIETY of duties,"  "S-Performing effectively under STRESS," "T–Attaining

precise set limits, TOLERANCES, and standards," ""U–Working UNDER specific

instructions," "P–Dealing with PEOPLE," or "J–Making JUDGMENTS and

decisions." *Id.* Thus, any error by the ALJ in failing to assess limitations related to

making judgments or adapting to change at the workplace was harmless, because

neither is required for the position of an eyeglass frame cleaner.

The Court notes that Plaintiff has severe abnormalities in his cervical spine.

However, the medical imaging in the record shows that these abnormalities were

present in April of 2009, when Plaintiff reported that he could perform his activities of daily living, walk more than a quarter mile, stand for up to sixty minutes, lift light to medium weights, and travel on journeys of more than two hours. (Tr. 292, 300-01). The medical imaging also shows that, through May of 2011, these abnormalities remained unchanged. (Tr. 349-50). Thus, he had the same abnormalities during his eighteen month gap in treatment (and complaints). A claimant cannot meet his burden to show that he is disabled within the meaning of the Act simply by demonstrating abnormalities; he must also demonstrate that the limitations arising from these abnormalities precludes him from performing work.  Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment.  *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); accord, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006). Here, a reasonable mind could accept the relevant evidence as adequate to support the ALJ's conclusion that, despite Plaintiff's impairments and cervical abnormalities, he could perform work in the national economy. The Court recommends denying Plaintiff's appeal, affirming the decision of the Commissioner, and closing the case.

## VII.    Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.     This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28

U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 28, 2015                    s/Gerald B. Cohn
                                 GERALD B. COHN
                           UNITED STATES MAGISTRATE JUDGE